# EXHIBIT 7

**USPTO** UNITED STATES
PATENT AND TRADEMARK OFFICE

P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **90/015,761** | **05/05/2026 03:28:31 PM Z ET** | **0440101RX1** |

## Title of Invention

PROCESSOR CORE COMMUNICATION IN MULTI-CORE PROCESSOR

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility / ex parte reexam | PATENT # | 8549339 |
| CONFIRMATION # | 4243 | FILED BY | Evan Gunderman |
| PATENT CENTER # | 75888178 | FILING DATE | 12/09/2025 |
| CUSTOMER # | 25700 | FIRST NAMED INVENTOR | - 8549339 |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | Michael Farjami |

## Documents

# TOTAL DOCUMENTS: 3

| DOCUMENT | | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|---|
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026.pdf | | 27 | - | 312 KB |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026-TRAN.LET.pdf | (1-1) | 1 | Transmittal Letter | 190 KB |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026-RXOR.T.pdf | (2-26) | 25 | Reexam Timely Patent Owner's Stmnt in Resp to Order | 270 KB |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026- | (27-27) | 1 | Reexam Certificate of Service | 185 KB |

RXC/SR.pdf

## Digest

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026.pdf | 8350083B1746AA99BD5C9B6D5E8DDF0F4D2A65EAC9B28FEDC4B3F9C0974AB22F37ACFAF3DBF47B34C67ACC772E0E3DB0297B9B926CF6B9055C2C6E47FFC30F6D |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026-TRAN.LET.pdf | C0AB07C40FD7F74405AE10BF4A6061B81A7DD32029FBF5D15272E106F2B04D717C38727B9BB57E4C0334E4529E637DE7C3DD973AF760F42C640C87EA715B4BAA |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026-RXOR.T.pdf | 3193AFBD0F67BBBA9529CF33939824D7544F626AA66588A992333A8CE481451C3D32B6AF5D53DE7ACBD906E215222F7A82A87AFA10318F3C44A9C44B8AF19815 |
| 0440101RX1_Patent_Owner_Statement_Under_37_CFR_May_05_2026-RXC/SR.pdf | 9E93AA7638EC492EBF4E181C1E90DA80F32E83B395DC7F0DC79E9EBF8A6C64AF47C2CF4CA6D023510820DA7A56F35F52B08EBEB149813E2092BA0BB761A723AF |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.



# FARJAMI & FARJAMI LLP

### AN INTELLECTUAL PROPERTY LAW FIRM

w w w . f a r j a m i . c o m

26522 La Alameda Avenue, Suite 360
Mission Viejo, California 92691
tel: (949) 282-1000
fax: (949) 282-1002

**ELECTRONIC TRANSMISSION COVER SHEET**

<u>Date:</u>          May 5, 2026

<u>To:</u>            United States Patent and Trademark Office
               Examiner: Campbell, Joshua D.; Art Unit: 3992

<u>Re:</u>            Ex Parte Reexamination, Control No.: **90/015,761**
               U.S. Patent No.: **8,549,339**
               Filing Date: **Feb. 26, 2010**
               Issuance Date: **Oct. 1, 2013**
               Attorney Docket No.: **0440101RX1**

<u>From:</u>         Farjami & Farjami LLP

<u>Number of pages including the cover sheet:</u> 27

<u>Message</u>:

  Enclosed please find Patent Owner's Statement under 37 C.F.R. § 1.530.

  Authorization is hereby given to the Commissioner to charge any fees associated with this communication or credit any overpayment to Deposit Account **50-0731**.

The documents accompanying this facsimile contain PRIVILEGED AND CONFIDENTIAL information intended only for use of the individual or entity named above. If you are not the intended recipient, disclosure, copying, distribution or use of the contents of this facsimile information is prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original facsimile to us at the above address via U.S. Postal Service. We will reimburse you for all expenses incurred.

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| **In re Patent of Wolf et al.** | Art Unit: 3992 |
| Ex Parte Reexamination, Control No.: **90/015,761** | Examiner: Campbell, Joshua D. |
| U.S. Patent No.: **8,549,339** | Attorney Docket No.: 0440101RX1 |
| Filing Date: **Feb. 26, 2010** | |
| Issuance Date: **Oct. 1, 2013** | |
| For: **Processor Core Communication in Multi-Core Processor** | |

## PATENT OWNER'S STATEMENT UNDER 37 C.F.R. § 1.530

**Mail Stop *Ex Parte* Reexam**
Central Reexamination Unit
Honorable Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir/Madam:

This Patent Owner's Statement under 37 C.F.R. § 1.530 is in response to the Request for *Ex Parte* Reexamination ("Request" or "Req.") filed on December 9, 2025, and the subsequent Order Granting Request for *Ex Parte* Reexamination issued by the USPTO on March 6, 2026.

The Commissioner is hereby authorized to charge payment of any additional fees associated with this communication, or credit any overpayment to Deposit Account No. 50-0731.

Page 1

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................3

II.     OVERVIEW OF THE '339 PATENT ................................................................6

III.    U.S. PATENT NO. 7,263,457 TO WHITE ("WHITE")....................................7

IV.     U.S. PATENT APPLICATION PUBLICATION NO. 2009/0271646 TO TALWAR ("TALWAR").................................................................................9

V.      U.S. PATENT NO. 7,669,151 TO BOYLE ("BOYLE")..................................14

VI.     "DYNAMIC VOLTAGE AND FREQUENCY SCALING (DVFS) SCHEME FOR MULTI-DOMAINS POWER MANAGEMENT," J. LEE ET AL. ("LEE") ...........19

VII.    CONCLUSION.................................................................................................24

## I.    INTRODUCTION

The Request presents six substantial new questions ("SNQs") of patentability—SNQ1 through SNQ6— against the U.S. Patent No. 8,549,339 (the "339 Patent").  As grounds for SNQ1 and SNQ3-SNQ6, the Request relies on a combination of at least three references, which are U.S. Patent No. 7,263,457 to White et al. ("White"), U.S. Patent Application Publication No. 2009/0271646 to Talwar et al. ("Talwar"), and U.S. Patent No. 7,669,151 to Boyle et al. ("Boyle").  *See* Req., 17-18.  As grounds for SNQ2, the Request relies on a combination of three references, which are White, Talwar, and "Dynamic Voltage and Frequency Scaling (DVFS) Scheme for Multi-Domains Power Management" to Lee et al. ("Lee").

The present Request relies on White as the primary reference in grounds for SNQ1 and SNQ3-SNQ6.  White had been before the USPTO as prior art against the '339 Patent on three different occasions.  It was first disclosed in an information disclosure (IDS) on August 2, 2011 and considered by the USPTO's Examiner on August 22, 2012 during prosecution of the application that issued as the '339 Patent.  In the sole Non-Final Office Action dated August 29, 2012, the Examiner found six other references more pertinent than White to the then-pending claims and relied on those references, rather than White, to reject the claims under 35 U.S.C. § 102 and § 103.

White was again before the USPTO in an *Inter Partes* Review (IPR)—IPR2025-00485— filed on January 22, 2025 against the '339 Patent.  In this IPR, the Petitioner relied on White in combination with Talwar under Grounds 1, 2 and 3.  *See NXP USA, Inc. and Qualcomm Incorporated  v. Redstone Logics LLC*, IPR2025-00485, Paper 1 at 7 (PTAB Jan. 22, 2025) (the

"NXP IPR"). The merits presented in the NXP IPR were not deemed sufficiently compelling to avoid discretionary denial of the IPR. *See id,* Paper 11 at 2 (PTAB Jul. 10, 2025). In issuing the discretionary denial, the USPTO stated that: "After considering the parties' arguments and the record, and in view of all relevant considerations, discretionary denial of institution is appropriate in this proceeding. ***This determination is based on the totality of the evidence and arguments the parties*** have presented." *Id.* (emphasis added). And that "the determination to exercise discretion to deny institution is based on a holistic ***assessment of all of the evidence and arguments presented***." *Id.* (emphasis added).

In another IPR—IPR2025-01532—filed on September 16, 2025 against the '339 Patent, the Petitioner relied on White in combination with Talwar under Ground 1. *See Apple, Inc. v. Redstone Logics LLC,* IPR2025-01532, Paper 1 at 16 (PTAB Sep. 16, 2025) (the "Apple IPR"). In this IPR , Lee was also relied upon in Ground 1 in combination with White and Talwar, and under Grounds 2 and 3 in combination with other prior art references. *Id.* The merits presented in the Apple IPR were again not deemed sufficiently compelling by the USPTO to avoid discretionary denial. *See id,* Paper 10 at 1 (PTAB Jan. 27, 2026).

The '339 patent was subject of yet another IPR that did not rely on White, Talwar or Lee, but did rely on U.S. Patent Application Publication No. 2005/0034002 to Flautner ("Flautner") under Grounds 2 and 6. *See MediaTek, Inc. v. Redstone Logics LLC,* IPR2025-00085, Paper 1 at 5-6 (PTAB Oct. 22, 2024) (the "MediaTek IPR"). Flautner is relied upon in Ground 4 of the present Request. Req., 18. The PTAB denied institution of the MediaTek IPR on the merits. *See id.,* Paper 7 (PTAB Apr. 22, 2025).

This record demonstrates multiple unpersuasive attempts at the same argument. After having had the benefit of reviewing the three Patent Owner Preliminary Responses (POPRs) in the aforementioned IPRs (the NXP IPR, the Apple IPR, and the MediaTek IPR), Requester has searched for and added another reference—Boyle— to the references previously before the USPTO multiple times—White, Talwar, and Lee— in order to advance hindsight reconstruction obviousness arguments against independent Claims 1 and 21 of the '339 Patent.

Setting aside several errors in the Request's recitation of procedural matters,[1] the prior art presented in the Request fails to render independent Claims 1 and 21 of the '339 Patent obvious. In the interest of brevity, this Patent Owner's Statement focuses on the following claim elements of Claim 1 (and similar claim elements of Claim 21) that are not disclosed by or suggested by any combination of the prior art asserted under Grounds 1-6 of the Request:

> "first output clock signal of a first phase lock loop (PLL) having a first
>
> clock signal as input;

_____

[1] As one example, the Request erroneously states that: "The PTAB denied institution of IPR2025-00085, finding the asserted prior art (**which is not raised in this Request**) did not demonstrate a reasonable likelihood of prevailing and demonstrating the unpatentability of any of the challenge claims of the '339 Patent." Req., 5 (emphasis added). In fact, the art reference *Flautner* was an asserted prior art in IPR2025-00085 and is also asserted in the present Request. As another example, the Request incorrectly states that the '339 Patent was subject of IPR2024-00974, which "settled" before "Before the merits [] could be determined by the Patent Trial and Appeal Board." *See* Req., 5. IPR2024-00974 was filed against U.S. Patent Number 9,253,925 titled "Panel for enhancing thermal conduction in an electronic assembly" which is not in any way related to the '339 Patent.

"a second output clock signal of a second PLL having a second clock signal as input, wherein . . . the first clock signal is independent from the second clock signal."

Although this Patent Owner's Statement addresses the claim elements identified above, Patent Owner does not concede or imply that other claim elements are disclosed or suggested by the prior art in the Request and expressly reserves the right to contend otherwise.

## II.    OVERVIEW OF THE '339 PATENT

At a high level, the '339 Patent is directed generally to a novel operation of a multi-core processor enabling coordination of groups of multiple cores operating with different supply voltages and clock signals. *See* the '339 Patent, 2:4-3:15.

The '339 Patent explains: a "multi-core processor [] may be divided into stripes… [where e]ach stripe may be associated with an independent power profile … and/or may be associated with an independent clock domain defined by a clock signal received from a clock control block." *Id.*, 2:25-31.  However, "[t]o maintain the limited differential relationship discussed above, adjusting the supply voltage to one stripe may involve adjusting the supply voltages to the other stripes." *Id.*, 3:8-10.

To address this, the '339 Patent describes an architecture wherein "the stripe [] may be powered by a supply voltage received from a power control block[] and/or may be associated with an independent clock domain defined by a clock signal received from a clock control block[]." *Id.*, 2:27-31.

This solution to the prior art problem of dynamic management of sets of processor cores is reflected, for example, in Claim 1 of the '339 Patent, which recites:

1. A multi-core processor, comprising:

a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is independent from the second supply voltage, and the first clock signal is independent from the second clock signal; and

an interface block coupled to the first set of processor cores and also coupled to the second set of processor cores, wherein the interface block is configured to facilitate communication between the first set of processor cores and the second set of processor cores.

All other challenged dependent Claims 2-5, 8-11, and 14 depend from Claim 1, and Claim 21 reads similarly to Claim 1.

## III.    U.S. PATENT NO. 7,263,457 TO WHITE ("WHITE")

Requester has relied on White as "raising a substantial new question of patentability ('SNQ')" for all Grounds 1-6 of the Request.  Req., 17-18.  White discloses a multi-core microprocessor in which logic cores 120A and 120B (collectively referred to as "logic cores 120" in White) can operate at independent voltages and frequencies for power management and temperature control.  *See* White, Abstract, 2:26-44.  The output of frequency regulator 140 is fed to logic cores 120A and 120B.  *See, e.g., id.,* Figs. 1, 2A-2C.  Power management logic 200 coordinates frequency regulator 140 and voltage regulator 130, and operating settings are drawn

from "a table of compatible or desirable voltage-frequency pairs." *See, e.g., id.,* Fig. 2A, 10:66-11:2.

White discloses that "a clock signal at a single frequency may be coupled to logic cores 120 and each core may generate a specific internal operating frequency derived from this signal." *Id.*, 8:37-40.  White further discloses supplying different frequencies to logic cores without requiring PLLs and without providing independent clock signals inputted to PLLs. White states that "multiple clock signals at differing frequencies may be generated either off-chip or internally and coupled to individual logic cores" *Id.*, 8:34-36.  White identifies no need for and no benefit to providing independent reference clocks to different individual PLLs.

Despite Requester's heavy reliance on White as the primary reference for *all* asserted Grounds 1-6 in the Request, White is not about PLLs, much less the clock signals that purportedly feed PLLs.  The Request itself states that "White does not include a drawing showing a first PLL and a second PLL, as claimed with the corresponding input clock signals and output clock signals."  Req., 28.  More precisely, White does not have any drawings showing a single PLL or any drawing identifying a single clock signal.  Phase locked loop (PLL) is mentioned passingly only in two places in White (*see id.*, 7:38-40, 9:62-10:7), with a lone mention of "a phase-locked loop (PLL) locked to an externally provided clock signal . . . [wherein the] internal operating frequency of the logic core may be a multiple of that of the external clock signal as determined by configuration parameters of the PLL." *Id.*, 9:63-10:1.

In sum, White does not disclose or suggest the claim elements "a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;" or "wherein each processor core from the second set of processor cores is configured to dynamically receive a second

supply voltage and a second output clock signal of a second PLL having a second clock signal

as input," or "the first clock signal [being] independent from the second clock signal." To

bridge this significant gap in White's disclosure, the Request relies on Boyle through the

conclusory assertion that "applying Boyle's disclosure, the PLL included in each of White's

frequency regulator( s) 140 would each receive different input clock signals from different

oscillators (RI and R2), as taught by Boyle, and, in tum, provide different output clock signals to

the first [red] and second [green] sets of cores . ..." *See* Req., 28.  However, as explained in § V

below, this reliance on Boyle is misplaced.

## IV.    U.S. PATENT APPLICATION PUBLICATION NO. 2009/0271646 TO TALWAR ("TALWAR")

In addition to White and Boyle (discussed in § V below), Requester has also relied on

Talwar for Grounds 1 and 3-6.  Req., 17-18.  The Patent Owner submits that the following

elements of Claim 1 (and similar elements of Claim 21) are not disclosed or suggested by any

combination of White and Talwar:

> "a first set of processor cores of the multi-core processor, wherein each
>
> processor core from the first set of processor cores is configured to dynamically
>
> receive a first supply voltage and a first output clock signal of a first phase lock
>
> loop (PLL) having a first clock signal as input;
>
> a second set of processor cores of the multi-core processor, wherein each
>
> processor core from the second set of processor cores is configured to dynamically
>
> receive a second supply voltage and a second output clock signal of a second PLL
>
> having a second clock signal as input, wherein the first supply voltage is

Page 9

independent from the second supply voltage, and the first clock signal is

independent from the second clock signal."

By way of overview, Talwar explains that in a conventional multi-processor chip where

all processors share a single voltage source, reducing the frequency of one processor yields little

power savings because the voltage supplied to that processor cannot be reduced independently;

instead, the shared voltage must remain high to support processors operating at higher

frequencies. *See* Talwar, [0004].

Talwar implements a solution in a virtual computing environment in which a hypervisor

runs multiple virtual machines (VMs), a management VM monitors CPU utilization, and a

Multi-Core Power Module (MPM) of the hypervisor executes power management decisions.

*See id.*, [0014]-[0018].  A feature emphasized as being important in Talwar is VM migration

between clusters.  Instead of changing the frequency of a core to meet the needs of a VM using

that core, the MPM may migrate the VM to another set of cores already running at the desired

frequency, leaving the vacated set of cores available for frequency reduction.  *See id.*, [0020]-

[0025].

Talwar is a hypervisor-level disclosure that addresses an inefficiency in architectures

where there is "only one voltage source for all the cores of a chip plugged into a motherboard

socket." *See id.*, [0012].  Talwar groups cores into "clusters" defined by the voltage source

supplying them and manages power by migrating virtual machines (VMs) between clusters via a

multi-core power module (MPM) and management VM (MVM). *See id.*, [0011], [0017]-[0023]

and Figures 1-3.  White, by contrast, is an integrated circuit-level disclosure focused on per-core

voltage/frequency control of two individual logic cores (120A, 120B) on a single die for power

management and temperature control. *See, e.g.,* White, Abstract, 6:26-50, 11:64-12:1, and Figures 2B-2C, 6-7.

The architecture in Talwar identifies VM migration as the solution. The premise on which the clustering and migration approach in Talwar depends —MPM and MVM— has no relation with the premise of per-core regulators 130 and 140 required by White. *See, e.g.,* White, 7:23-45. Each reference, on its own terms, is complete: Talwar achieves power savings through VM mediated migration, White achieves thermal/power management through per-core regulation. Neither identifies a problem the other solves and there is no articulated benefit to their combination.

The primary basis the Request enumerates for combining White and Talwar is that a POSITA ("Person of Ordinary Skill in the Art") would supposedly "have understood [White's] design would ***need*** to be adapted as the number of cores increases due to ***chip space*** constraints associated with adding ***an additional voltage and clock control and supply circuitry*** for each additional core." Req., 25 (citations omitted) (emphases added).

However, this "***need***" does not exist. In fact, White itself explains the device it teaches may already "include ***any number*** of logic cores configured to operate at ***independent voltages and/or frequencies***." White, 6:56-60 (emphasis added). If any number of cores may already be configured to operate with their own independent voltages and frequencies, there is no ***need*** for further adapting to an architecture that provides grouped voltages and frequencies as the number of logic cores increases. A POSITA considering White would have no ***need*** to alter it, much less a motivation to achieve any particular configuration.

Page 11

Moreover, "*chip space*" is not a constraint in White.  White explains "a number of different voltages may be generated and/or regulated and input to integrated circuit 100 through various connections." *Id.*, 8:29-31.  "Likewise, multiple clock signals at differing frequencies may be generated either off-chip or internally and coupled to individual logic cores 120 and/or common bride logic 110." *Id.*, 8:34-37.  White already has a solution to the "chip space" constraint issue, that is to simply generate the voltages and clock signals outside the integrated circuit or "off-chip."  Since White provides the solution that does not require any change due to the alleged "need," no motivation exists to combine White and Talwar.

Furthermore, the expert has merely repeated Requester's argument regarding the purported "*chip space* constraints associated with adding *an additional voltage and clock control and supply circuitry* for each additional core."  *See* Kulkarni Decl., ¶ 30 *citing* EX 1015 (Kim Paper) pp. 3-4; EX 1016 (Kaxiras Textbook), pp. 52-53 (emphases added).  However, the expert's cited references—Kim Paper, pp. 3-4 and Kaxiras, pp. 52-53—only discuss chip multiprocessors (CMPs) and Dynamic Voltage and Frequency Scaling (DVFS), but do not discuss chip space constraints or chip space at all.  Therefore, Requester's evidence does not support its argument that the purported additional chip space needed for "additional voltage and clock control and supply circuitry" would be a compelling design consideration, when there are numerous tradeoffs between chip space and functional design goals in multi-core processors.  Moreover, there is no evidence that the "additional voltage and clock control and supply circuitry" takes a significant amount of chip space to be of concern to begin with.

Indeed, the Request provides no evidence that the total combined chip space consumed by the "additional voltage and clock control and supply circuitry" for each core would be any

greater than the chip space used by a far more complex "voltage and clock control and supply circuitry" used for a cluster of cores. The space-consuming, complex and challenging clock and power interconnect routing from a unified "voltage and clock control and supply circuitry" for distributing clock and power to reach the different cores in a cluster of cores may, by itself, erase any purported savings of chip space.

More fundamentally, Talwar relies on VM migration, MPM and MVM as the solution, which bear no relation to the per-core regulators 130 and 140 required by White. Talwar achieves power savings through VM mediated migration, while White achieves thermal/power management through per-core regulation. There is no suggestion or motivation for a POSITA to combine the disclosures of Talwar and White since neither reference identifies a problem the other solves and there is no stated benefit to their combination.

Based on all the above, the Patent Owner submits that the following elements of Claim 1 (and similar elements of Claim 21) are not disclosed or suggested by any combination of White and Talwar:

> "a first set of processor cores of the multi-core processor, wherein each processor core from the first set of processor cores is configured to dynamically receive a first supply voltage and a first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;
>
> a second set of processor cores of the multi-core processor, wherein each processor core from the second set of processor cores is configured to dynamically receive a second supply voltage and a second output clock signal of a second PLL having a second clock signal as input, wherein the first supply voltage is

Page 13

independent from the second supply voltage, and the first clock signal is independent from the second clock signal."

## V.   U.S. PATENT NO. 7,669,151 TO BOYLE ("BOYLE")

Requester has relied on Boyle in combination with White and Talwar under Grounds 1 and 3-6.  Req., 17-18.  Boyle is directed to a system that employs *only synchronous clocks* (i.e., clocks derived from a single "common clock source") and adjusts clock phases of the synchronous clocks to reduce power supply simultaneous switching noise.  *See, e.g.,* Boyle, 10:11-31, 12:38-46.  Requester has relied on Figure 9 of Boyle simply because it shows a clock source (118) feeding PLL 122 and another clock source (120) feeding PLLs 124 and 126.  However, *Boyle uses Figure 9 merely to illustrate the problem caused by using independent clock signals*.  According to Boyle, employing independent clock signals as inputs to PLLs result in PLL clock outputs that are not synchronous, which in turn causes power supply switching noise that cannot be controlled or managed.  *See, e.g., id.,* 10:21-31 and 12:38-46.

In describing Figure 9, Boyle states that: "Because clock domains CD1 and CD2 are clocked using clock signals derived from a common clock source 118, clock domains CD1 and CD2 are synchronous.  Similarly, clock domains CD3-CD7 are synchronous because they share a common clock source 120.  There is no synchronous relationship between CD1 or CD2 and any of the other clock domains (CD3-CD7) in the example of FIG. 9, because the circuitry of clock domains CD3-CD7 is clocked using clocks that are derived from a clock source (clock source 120) that is independent from clock source 118." *Id.,* 10:11-20.

In illustrating the problem with using "clocks that are derived from separate sources," and Boyle's solution of using clocks derived from a single source, Boyle states that:  "Because clock

Page 14

domains such as clock domain CD1 and CD6 (as an example) have clocks that are derived from separate sources, it is not possible to reduce power supply simultaneous switching noise by adjusting the phase between clocks C1 and C6.  Any phase relationship that is established between these clocks would tend to change as a function of time, as clocks R1 and R2 drift with respect to each other. However, synchronous clock domains such as clock domains CD3-CD7 may have their phases adjusted to reduce power supply simultaneous switching noise . . .." *Id.*, 10:21-31.

Boyle teaches that: "It is possible to reduce power supply simultaneous switching noise by adjusting clock phases for the clock domains within each group of circuit blocks that are associated with synchronous clock domains (i.e., by adjusting the clock phases of C1 and C2 of FIG. 9 in relation to each other), ***but not by adjusting the clocks of domains that are not in the same synchronous group*** (i.e., not by adjusting the phase of clock C1 relative to clock C3 in the FIG. 9 example)." *Id.*, 12:38-46 (emphasis added).

Indeed, throughout its disclosure, Boyle emphasizes that clocks derived from independent sources cannot be phase-managed because: "Any phase relationship that is established between these clocks would tend to change as a function of time, as clocks R1 and R2 drift with respect to each other." *Id.*, 10:25-27.  Boyle teaches that reducing simultaneous switching noise—the central objective of Boyle—requires synchronous clocks that ***share a common reference***. *See id.*, 10:28-31 and 12:38-46.

Boyle contrasts the disadvantages of using two clock sources 118 and 120 of Figure 9, with the advantages of using a single clock source such as the single crystal oscillator 142 in Figure 10.  Boyle states that: "An illustrative device 10 that includes circuitry in which power

Page 15

supply simultaneous switching noise may be reduced by clock phase adjustments is shown in FIG. 10. In the example of FIG. 10, a crystal oscillator 142 produces a reference clock REF. Phase-locked loop circuit 140 (or other suitable circuitry such as a delay-locked-loop, etc.) receives the REF clock and produces two corresponding clock signals CLK1 and CLK2 at outputs 144 and 146, respectively." *Id.*, 10:32-39.

Consequently, Boyle **teaches a POSITA away** from anything that the Requester would identify as independent clock signals to feed the alleged first and second PLLs in White, since Boyle emphasizes the undesirability of independent clock sources as inputs to different PLLs. Accordingly, Requester's hindsight reconstruction is not only improper, but also fails on its own terms, because Boyle teaches that multiple clock sources (e.g., 118 and 120) are undesirable due to the resulting non-synchronous clocks.

Requester has employed impermissible hindsight reconstruction to search for a reference—Boyle—that shows more than one clock source feeding different PLLs,[2] even then Requester has failed to establish why a POSITA would look to Boyle that teaches the opposite of what the Request wishes to establish, since Boyle underscores the need to avoid using different clock references feeding different PLLs.

---

[2] Hindsight reconstruction (or hindsight bias) has been long frowned upon by the Federal Circuit. In *Zoltek Corp. v. United States*, 815 F.3d 1302 (Fed. Cir. 2016), the Federal Circuit reaffirmed that "[t]he Court has recognized 'the distortion caused by hindsight bias' and 'arguments reliant upon *ex post* reasoning' in determining obviousness. *KSR*, 550 U.S. at 421; … ('It appears that [the expert] relied on the … patent itself as her roadmap for putting what she referred to as pieces of a 'jigsaw puzzle' together.')" *Id.* at 1313 (citations omitted).

In addition, a POSITA designing the multi-core processor of White would have no motivation to consult a reference such as Boyle, because the problems each reference solves do not overlap. Boyle's stated objective, i.e., phase-adjusted synchronous clocks to reduce power supply simultaneous switching noise, is not a problem White identifies or seeks to solve. Indeed, White already discloses a simpler alternative to achieve different frequencies for its processor cores through different PLL multiplier settings applied to a single shared reference. *See, e.g.,* White, 8:37-40 ("a clock signal at a single frequency may be coupled to logic cores 120 and each core may generate a specific internal operating frequency derived from this signal."). According to White: "Each logic core of integrated circuit 100 may include a corresponding set of control registers through which its PLL configuration parameters may be set …." *Id.*, 10:4-6. A POSITA would find no reason to discard this existing solution in White in favor of the two oscillator arrangement discussed in relation to Figure 9 of Boyle, which adds cost and complexity (a second oscillator), and offers no benefit White identifies as desirable.

The Request turns Boyle's clear teaching—namely, the avoidance of clocks generated from more than one reference clock source— on its head by asserting that: "A POSITA would be ***motivated to apply Boyle's teaching of using a plurality of phase-locked loops driven by different oscillators to generate asynchronous clock domains*** to White/Talwar . . .." Req., 26 (*citing* Kulkarni Decl., ¶ 35) (emphasis added). Accordingly, Requester portrays Boyle as standing for the opposite of its actual teaching.

The operative portion of this portrayal has been repeated verbatim by Requester's expert: "In my opinion, a POSITA would be further ***motivated to apply Boyle's teaching of using a***

*plurality of phase-locked loops driven by different oscillators to generate asynchronous clock domains* to White/Talwar  . . .."  Kulkarni ¶ 35 (emphasis added).

The expert's repetition of a conclusory attorney argument should be given no weight. *See MediaTek, Inc. v. Redstone Logics LLC*, IPR2025-00085, Paper 7 at 20 (PTAB Apr. 22, 2025): "We do not credit [the expert's] testimony on this point because it lacks sufficient explanation and is inconsistent with the disclosure of [the cited reference] as detailed above.  37 C.F.R. § 42.65(a) ('Expert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight'); *Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15 (PTAB Aug. 24, 2022) (precedential)."  *See also Xerox Corp. v. Bytemark, Inc.*, IPR2022-00624, Paper 9 at 15-17 (PTAB August 24, 2022) (designated precedential) (expert declaration that merely repeats "the conclusory assertion for which it is offered to support" "is entitled to little weight").

As with *MediaTek, Inc.*, the expert testimony here should be afforded no weight since it is conclusory and unsupported and, more importantly, is inconsistent with Boyle's disclosure, which teaches the undesirability of clocks generated by more than one reference clock source.

Requester once more relies solely on its expert's conclusory statement to assert that a POSITA would combine Boyle with White.  The Request asserts that "[i]n light of White's teaching of multiple frequency regulators, which each can include a PLL driven by an 'externally provided clock signal' to provide independent clock frequency signals, EX1004, 9:54-67, a POSITA *would have applied Figure 9 of Boyle to* White/Talwar with a reasonable expectation of success.  In particular, any proposed modification would be minimal and is well within the knowledge and capabilities of a POSITA."  Req., 29, *quoting* Kulkarni Decl., ¶ 37

(emphasis added).  The expert's declaration itself is identical to and merely repeats this conclusory attorney argument.  *See* Kulkarni Decl., ¶ 37.

Again, as with *MediaTek, Inc.*, the expert testimony here should be given no weight since it lacks explanation and is, more importantly, inconsistent with the disclosure of Boyle that teaches the undesirability of using multiple reference clock sources feeding separate PLLs and uses Figure 9 to illustrate this undesirability.

Based on all the reasons discussed above, there was no motivation for a POSITA to combine White/Talwar with Boyle in a manner to render the following claim elements in Claim 1 (and similarly in Claim 21) of the '339 patent obvious:

> "first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

> "a second output clock signal of a second PLL having a second clock signal as input, wherein . . . the first clock signal is independent from the second clock signal."

Moreover, even if White/Talwar and Boyle were to be combined, the result would be using a single clock source to generate synchronous clock signals as required by Boyle, which does not disclose or suggest first and second independent clock sources feeding first and second PLLs, as required by Claims 1 and 21.

## VI.    "DYNAMIC VOLTAGE AND FREQUENCY SCALING (DVFS) SCHEME FOR MULTI-DOMAINS POWER MANAGEMENT," J. LEE ET AL. ("LEE")

Lee falls far short of disclosing or suggesting the following claim elements in Claim 1 (and similar elements in Claim 21) of the '339 patent:

Ex Parte Reexamination, Control No.: 90/015,761
Patent Owner's Statement

> "first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;
>
> > "a second output clock signal of a second PLL having a second clock signal as input, wherein . . . the first clock signal is independent from the second clock signal."

Lee discloses a three-domain Dynamic Voltage and Frequency Scaling (DVFS) scheme in which each power domain is served by its own continuous co-locking (CoCoLo) power management unit (PMU) containing a merged PLL and a linear regulator. *See* Lee, Abstract and §§ II, III.A. Figure 4 of Lee shows a single "Reference Clock" feeding the Phase Frequency Detector of the PLL of one CoCoLo PMU. Figure 2 shows three instances of CoCoLo PMUs configured as a "Triple Domains Power Management" (TDPM) system. Lee's TDPM system nowhere discloses or suggests that multiple *reference clocks* are utilized, or that a PLL within one PMU receives a *reference clock* different from *reference clocks* provided to the PLLs in the other two PMUs.

The list of innovations identified in Lee, i.e., PMU loop for PMU control (Fig. 1(a)), Performance Indexing (PI) (Fig. 1(b)), TDPM (Fig. 2), DVFS for multi-domain power management (Fig. 4), the merged PLL/LR (Linear Regulator) structure (Fig. 4), the Selectively Low Impedance Node (SLIN) circuit (Fig. 6), and the programmable Voltage Controlled Oscillator (VCO) (Fig. 4), does not include the use of more than a single reference clock or having reference clocks that are independent of one another. *See id.*, §§ III.A- III.D, V.

Moreover, Lee's emphasis on reuse of a single PMU as an intellectual property (IP) block naturally leads to multiple instances of that block being driven by a common reference clock.

Ex Parte Reexamination, Control No.: 90/015,761
Patent Owner's Statement

*See id.*, §II ("[t]he proposed PMU can be reused as an Intellectual Property (IP)), §III.C, §V ("[CoCoLo] is used as the Intellectual Property (IP) with the programmable VCO"), and Figs. 2, 4, 8.

Requester's expert has simply repeated the Request's statement that "Lee supplies White and Talwar with the detailed logic design for implementing clock generation and synchronizers required for a multi-cluster (multi-domain) DVFS system." *See* Kulkarni Decl., ¶ 107 and Req., 68.

However, the purported "detailed logic design for implementing clock generation and synchronizers required for a multi-cluster (multi-domain) DVFS system" supplied by Lee merely teaches that each PMU operates with a different clock frequency provided by its PLL. Lee in no way discloses or suggests different *reference clocks* as inputs to the different PMUs or as inputs to the PLL in each PMU.  To the contrary, Lee teaches that all PMUs, such as the three PMUs feeding Domains 1, 2, and 3 in Figure 2, operate using a *single reference clock* that is converted to the desirable clock frequency for each PMU by using a "Performance Index" resulting in the clock frequency suitable for each domain to be outputted as a respective "CLK" signal to each Domain 1, 2, and 3. *See* Lee, II. A-B, III.A-D, Fig.2 and Fig.4.  The shared reference clock is shown as "Reference Clock" feeding the PLL depicted in Figure 4. *Id.*, Fig. 4. In fact, the emphasis in Lee on reuse of a single PMU as an intellectual property (IP) block is implemented by driving multiple instances of that block from a common reference clock. *See id.*, §§ III.C, V, Figs. 2, 4, 8.

The Request fails to identify any disclosure or suggestion in Lee addressing this fundamental deficiency—namely, the use of *different reference clocks*, each supplied to a

Page 21

different PLL, as required by Claims 1 and 21 of the '339 patent. To the contrary, Lee discloses the use of *a shared reference clock*, as discussed above.

The Request correctly notes that Lee's PMUs operate at different voltages and clock frequencies, with each PMU's clock generated by a corresponding PLL. But the Request then makes an unsupported leap to bridge a clear gap in Lee—namely, the absence of any disclosure or suggestion of *different reference clocks* being supplied to different PLLs.

In an effort to compensate for Lee's failure to disclose a significant claimed feature in the '339 patent—namely, first and second clock signals feeding first and second PLLs, where the first clock signal is independent from the second clock signal —the Requester's expert cites no portion of Lee and merely repeats the same conclusory assertion advanced in the Request. Specifically, the expert states: "Further, as each of the domains has its own separate and independent reference clock input, Lee also discloses separate independent reference clocks to each of the domains. Further, Figure 8 illustrates that the PMUs are located at different corners of a die, and thus, a POSITA would understand that the reference clocks may be supplied to each of the domains from independent off-chip sources." Decl., ¶ 98 and Req., 65. This assertion is unsupported and incorrect.

The fact that the assertion relies on Figure 8 of Lee is telling, as Figure 8 merely reflects a physical layout for the circuit schematic shown in Figure 2 and adds no new disclosure beyond Figure 2. Neither Figure 2 nor Figure 8 discloses or suggests *different reference clocks* as inputs to different PLLs. Indeed, as discussed above, Lee relies on a *single reference clock* shown in Figure 4 to generate the various clock frequencies for each instance of the three PMUs shown in Figures 2 by adjusting the "Performance Index" in Figure 2. *See, e.g.,* Lee, §II.A

("[a]ccording to the performance index, the PMU generates the clock and the supply voltage to adjust the speed of target domain."). Indeed, utilizing different reference clocks to feed different PLLs would negate the purpose of having a Performance Index, since Lee uses the Performance Index to produce different clock frequencies for each domain using a single reference clock.

In addition, Requester does not to provide any support for its assertion that Lee "discloses *separate independent reference clocks* to each of the domains" (*see* Decl. ¶ 98, and Req., 65). The term "reference clock" is used only once in Lee, which is the "Reference Clock" labeled in Figure 4. Moreover, the term "independent" has been used only three times in Lee, all of which are in relation to independent power domains, which operate by independent adjustment of their respective voltage and clock frequency, but none of which refers to "*separate independent reference clocks*." The three instances of the use of the term "independent" in Lee are quoted below:

> "In this work, we manage the power of 3D graphics engine that has *independent domains*, and each domain has different performance requirements." *Lee*, § I.

> "This work proposes the triple domains DVFS power management scheme for graphics processing unit (GPU). The proposed low-power GPU is composed with RISC, geometry processor (GP) and rendering engine (RE). And each part is *independent power domain*." *Lee*, § II.

> "We propose dynamic voltage and frequency scaling scheme for multi-domains power management. The three power management units used this scheme are fully integrated on-chip to apply DVFS for 3D graphics

processing unit (GPU) which has ***triple independent power domains***." *Lee,* § V.

Based on all of the above it is manifest that, as is the case with Boyle, Lee fails to disclose or suggest the following claim elements of the '339 patent:

"first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

"a second output clock signal of a second PLL having a second clock signal as input, wherein . . . the first clock signal is independent from the second clock signal."

Thus, any combination of White, Talwar and Lee also fails to disclose or suggest the above-recited claim elements since the Request relies on Lee to supply these claim elements that are missing in White and Talwar.

## VII.    CONCLUSION

The prior art presented in the Request fails to render independent Claims 1 and 21 of the '339 patent obvious. At a minimum, the following claim elements of Claim 1 (and similar claim elements of Claim 21) are not disclosed by or suggested by any combination of the prior art asserted under Grounds 1-6 of the Request:

"first output clock signal of a first phase lock loop (PLL) having a first clock signal as input;

"a second output clock signal of a second PLL having a second clock signal as input, wherein . . . the first clock signal is independent from the second clock signal."

Although this Patent Owner's Statement has focused on the claim elements identified above, Patent Owner does not concede or imply that other claim elements are disclosed or suggested by the prior art in the Request and expressly reserves the right to contend otherwise.

For all the foregoing reasons, Patent Owner respectfully submits that the challenged independent Claims 1 and 21 are patentable and in condition for confirmation.  It is also submitted that Claims 2-5, 8-11 and 14 depending from Claim 1 are also patentable and in condition for confirmation due to the additional limitations in each dependent claim.

Respectfully Submitted,
FARJAMI & FARJAMI LLP


Dated: May 5, 2026              By:     /michael farjami/
                                        Michael Farjami
                                        Reg. No. 38,135
                                        FARJAMI & FARJAMI LLP
                                        Attorneys for Patent Owner Redstone Logics LLC



FARJAMI & FARJAMI LLP
26522 La Alameda Ave., Suite 360
Mission Viejo, CA 92691
Email: mfarjami@farjami.com
Tel: (949) 282-1000
Fax: (949) 282-1002

## CERTIFICATE OF SERVICE

I hereby certify that copies of the following documents are being served on the Third-Party Requester by first class mail, postage prepaid, on May 5, 2026:

- Transmittal Letter;

- Patent Owner's Statement Under 37 C.F.R. § 1.530; and

- Certificate of Service.

The copies were served at the following address:

> Jennifer Librach Nall
> Michael Saulnier
> DLA PIPER LLP (US)
> 303 Colorado St., Suite 3000
> Austin, TX 78701

Dated: May 5, 2026                              /michael farjami/
                                                Michael Farjami